**LAYNE–MINNESOTA CO. v. CITY OF BERESFORD, S. D.**

No. 13803.

United States Court of Appeals
Eighth Circuit.

May 26, 1949.

162

Frank Janes, Minneapolis, Minn. (Snyder, Gale, Hoke, Richards & Janes, Minneapolis, Minn., were with him on the brief), for appellant.

Eugene C. Mahoney, Sioux Falls, S. D. (Martin Miller, Beresford, S. D., was with him on the brief), for appellee.

Before GARDNER, Chief Judge, and RIDDICK and COLLET, Circuit Judges.

RIDDICK, Circuit Judge.

The Layne-Minnesota Company, hereinafter referred to as the contractor, brought this action against the City of Beresford, South Dakota, for a judgment declaring the respective rights and obligations of the parties under a written contract for the construction of a well and its equipment with a pump of sufficient capacity and a motor of sufficient power to deliver the production of the well to the water treatment plant at an elevation 43 feet above the point of pump discharge at the well head. The complaint also charged the City with breach of the contract and asked for a money judgment.

In its answer the City denied the allegations of the complaint, charged that the contractor was guilty of a breach of the contract, and asked a judgment against the contractor for damages sustained by the City because of the contractor's alleged refusal to perform the contract. The case was heard by the district judge without a jury and, without objection from either party, decided as an action for breach of contract.

The questions in dispute were the terms of the contract agreed upon by the parties, whether the City or the contractor was guilty of a breach of the contract, and the amount of the judgment to which the innocent party was entitled by reason of the wrongful act of the other.

The source of the controversy is to be found in the conflicting interpretations of the contract by the City and the contractor. The writings constituting the contract were the specifications for the work, the contractor's qualification data accompanying its bid, and a writing entitled "Contract" signed by the parties, all prepared by the engineer employed by the City. By reference the specifications were made a part of the contract and the qualification data a part of the specifications.

The specifications for the well were based upon facts known to the engineer concerning the depth and capacity of the wells then being used by the City and upon the history of their operation. From these facts the engineer could not in the specifications state the exact depth or water production capacity of the new well, nor all the details concerning the equipment to be installed in it and necessary to deliver the well production when determined to the City water treatment plant. Bids were therefore asked for drilling wells of different types and production and of approximate depth, and for the equipment of the well drilled with a pump and motor of capacity estimated to be sufficient to deliver the maximum production of the well of the type and production actually drilled.

Although the specifications made it clear that the City preferred to let one contract for the well and for its equipment to one

contractor, provision was made for bids of water production contractors for drilling the well and for bids from equipment manufacturers for the delivery of the necessary well equipment f. o. b. Beresford. Requirements for the well construction and for pumps and other equipment for the well were set out in separate sections of the specifications.

The forms for bid proposals were prepared in accord with the above provisions of the specifications. Because of the necessity for the prompt performance of the work, the contractor bidding for the construction of a well was required, in addition to stating his bid price for a completed well of minimum or basic water production, to describe his machinery and other equipment available for the work and to estimate the time within which he could begin work after the acceptance of his bid, and the time within which the work could be completed after its beginning. A contractor bidding on well equipment was required to give the price of equipment delivered at Beresford, estimated to meet the requirements of the equipment specifications for a well of the type and minimum production drilled by the well contractor, and to estimate the time within which the required equipment could be shipped after receipt of an order for it.

The contractor in this case was engaged in well drilling and in the manufacture of well pumps. Its bids were accepted for the construction of a well of a minimum water production of 100 gallons a minute and for the installation in the well of equipment of the power and capacity required to deliver the well production when determined. The bid prices for the well, $15,800, and for the estimated equipment, $2,414, were stated separately, with provision for additional compensation for additional motor power and pump column if required. But, since it was impossible to know the details of the required well equipment until the well was completed, the depth of the well and its water production known, the specifications provided that the details of the bid concerning pump and motor equipment were to be considered by the parties as tentative estimates; and that the type and size of pump bowl,

the depth of its setting in the well, the number and size of impellors with which the pump was to be equipped, and the power of the motor required to deliver the capacity of the well to the City water treatment plant would not be determined until the well was completed and the details of well equipment approved by the engineer.

The contractor in its qualification data agreed to begin work within 30 to 60 days from the date of the acceptance of its bid, to complete the well within 60 to 90 days from beginning work, to ship well equipment within 4 to 6 weeks from the date of the required authorized order for shipment, and to complete the installation of the equipment within 3 days of its arrival. The specifications provided a penalty of $10 for each day's delay in shipment of authorized equipment in excess of 10 days beyond the time estimated as required for shipment.

Negotiations between the parties for the contract began in February 1945. At that time the City was obtaining its water from two wells, one of which was out of commission and the production of the other decreasing and insufficient to meet the City's requirement for sanitation and fire protection. The City's desperate need for an increased water supply was known to the contractor.

The writing entitled "Contract," however, was not executed by the parties until March 29, 1945. Neither the "Contract" nor the specifications nor the bid proposal fixed a definite time for beginning or completing the work. The only reference in the specifications as to payment for the work is the provision that final settlement would be made upon final acceptance upon the basis of an actual test of the completed installation. The specifications did not otherwise fix the time for payment to the contractor. The "Contract" provided:

"The owner (the City) shall pay to the Contractor for the performance of this work in current funds as follows: 50% of the pump and motor price upon delivery of same at Beresford. Payment for the gravel wall well upon completion and acceptance of same, if partial payments have

not been recommended by the engineer and approved by the City Council prior thereto."

The specifications required bids "upon the completed well and pumping equipment to the point of pump discharge." The cost of pipe and other equipment to connect the pump discharge to the City water treatment plant was to be paid by the City under a separate contract to which the contractor in this case was not a party. The section of the specifications entitled "General Specifications" for wells provided that:

"If the well yield is more than 110% and less than 120% of the basic capacity, a 10% bonus on the contract basic price will be paid for the well. If the well yield is more than 121% * * * of the basic capacity, a 20% bonus on the contract price will be paid."

Corresponding deductions from the contract price for the well were provided for in the same section of the specifications in the event the actual production of the well was less than the basic capacity by either 10 or 20%. The City was given the right to reject the well if the production of the well constructed was less than 70% of the proposed minimum capacity.

Other provisions of the specifications gave the engineer the power to decide disputes concerning the interpretation of the contract and made his decision conclusive upon the parties; gave the contractor the right to terminate the contract upon 30 days' notice in writing to the City upon the failure of the City to pay the contractor for work done or material furnished when payment was due, and upon such termination relieved the contractor of liability to the City for nonperformance of the contract; and gave the contractor the right to recover the contract price for all work done and material furnished and all damages sustained. The specifications also provided that no oral agreement between the contractor and any of the officials of the City should be binding upon the parties or effective to change the obligations of either expressed in the written contract.

The engineer interpreted the contract to mean that the test of well capacity was required not only for the purpose of determining the details of the equipment to be installed in it and for the purpose of determining whether the contractor had earned the contract price for a well of minimum production, but also for the purpose of determining the contractor's right to the bonus for production over minimum requirements. That is to say, the engineer's interpretation of the contract was that, although the contractor completed a well with a basic capacity of more than 121 gallons a minute, it was not entitled to the payment of the contract price, much less the bonus, if the pumping equipment selected and ordered by the engineer, a matter over which the contractor had no control, failed to deliver the well's actual production to the water treatment plant.

The work of drilling the well began August 1, 1945, and was completed October 27, 1945. It is agreed that the work of well construction fully complied with every requirement of the specifications. Prior to the completion of the well the contractor on its own responsibility ordered the pump and motor estimated in its bid as sufficient to deliver the well production. This equipment, together with a test bowl for the pump, was delivered at Beresford and installed in the well on February 12, 1946. It is admitted that the delays which may have occurred between the execution of the contract and the installation of equipment were due to war shortages and were not the responsibility of the contractor.

On February 12 and 13, 1946, the well was tested for production, using the contractor's equipment. The pump, equipped with a temporary pump bowl of a capacity of 80 gallons and a 20 horsepower motor, delivered water at the pump discharge point at the rate of from 107 to 115 gallons a minute when pumped for a longer time than required by the specifications. The equipment at the well was used to fill the City's water tank. Delivery at that point averaged from 93 to 97 gallons a minute. It is admitted by the City that its measurements of water delivery at the tank were not care-

fully made. The record does not show that any other test was ever required by the City's engineer.

Following the test, the contractor demanded that the City's engineer specify the details of the equipment necessary to deliver the well production to the elevation required by the specifications. The test had shown that the 20 horsepower motor was not sufficient to deliver the full capacity of the well to the City water treatment plant without overloading, and the specifications prohibited the overloading of the motor. The president of the contracting company testified that the test was sufficient to show that, if the well was equipped with the pump on hand, with a bowl of proper design and capacity and depth of setting in the well, and with a 25 horsepower motor, a delivery of more than 121 gallons a minute to the water treatment plant was certain. He testified that he arrived at these conclusions by mathematical computation, using factors determined by the test of the well with equipment on hand and a formula universally accepted in hydraulic engineering for that purpose, and that he submitted his computations to the City's engineer and asked for authority to order the proper equipment. None of this testimony was disputed. On the contrary, the engineer testified on cross examination as follows (R. 172):

"Q. Did he (the contractor) submit to you figures, characteristics, or curve, or whatever is necessary to satisfy you that by the use of 25 horse power motor this well would produce, if proper bowls were placed at the bottom, would pump in excess of 121 gallons per minute? A. He didn't need to submit any figures to me, for me to agree to that.

"Q. Why? A. Because I know we could get it out of there. The figure that he proposed was not satisfactory.

"Q. Just a minute, you knew you got over 121 gallons out of there? A. I am satisfied of that."

The witness immediately attempted to qualify this statement, but his testimony was stricken by the court.

Neither the City nor its engineer accepted or rejected the contractor's computations to determine the equipment for the well called for by the contract. The position taken by the engineer on this question is shown by his letters to the contractor and to the Mayor. In a letter to the contractor of February 16, 1946, the engineer said (R. 79-80):

"If existing well conditions could have been anticipated following the completion of the drilling operations and a 25 hp motor and sufficient bowls incidental to promptly raise the water to the plant, the existing public approval of the well probably would have lead to acceptance and approval of a 20% bonus without question, but none of us could anticipate all of existing conditions. * * * Unfortunately the public and to some extent the usual layman does not understand the hydraulics of a well and the delays in construction incidental to war conditions are also not fully appreciated with resulting confusion of thought that is hard to handle.

* * * * * *

"Unofficial statement is made that if 135 or 140 gpm is delivered to the water treatment plant, there probably would be no objection to the installation of the 25 hp motor, but that delivery of 121 gallons or other similar small amount above 120 would not be satisfactory to the City."

The engineer continues to say that the contractor is justified in wanting to get as much as reasonably possible under its contract which calls for a 20% bonus for the delivery of more than 121 gallons of water a minute to the City water plant. But he urges that the contractor should give careful consideration to the "public and official attitude" at Beresford as it may affect other work in that vicinity. The engineer expresses the opinion that if additional bowls were added to the equipment on hand, possibly 115 gallons a minute or more could be pumped to the water treatment plant without overloading the 20 horsepower motor. He suggests that the City might be willing to pay the 10% bonus if the addition of the extra bowls did not involve delays or extra expense incidental to a change in the size of the motor.

This letter is an admission by the engineer that the equipment used to test the

well was not of the capacity which the contractor was obligated to install and the City to accept and pay for; that the equipment suggested by the contractor would meet contract requirements; and that, although the contractor was entitled under the contract to install equipment which would deliver 121 gallons or more to the City water plant and the City was obligated to accept and pay for equipment of that character, nevertheless, the City was unwilling to live up to its obligation. In the light of this statement, the engineer's further assertion in the letter that he was not "authorized to ask for or to approve the larger motor" must be interpreted to mean that he was unwilling to comply with this provision of the contract in the face of the "official attitude" at Beresford.

The contractor continued to insist on its right to have the order for proper equipment authorized.

On March 31 the engineer wrote the Mayor of Beresford as follows (R. 107-108):

"The well pumping 115 g. p. m. to ground surface is sand free and good. We do not know what will develop if greater quantity of water is pumped. I believe it will clear up O.K. to a yield of 150 g.p.m. or more * * *.

* * * * * *

"I believe under the specs if he (the contractor) had left a pump in place to give the city a temporary water supply, he could have made one or more additional installations to get as big production as possible, and this additional water would have been cheap water from the city standpoint, but after all the delay there has been due to war that may not be charged to Rogers (contractor's president), I believe the Courts will approve your demand for water Now.

"I have emphasized this repeatedly but do not think it advisable to put out a definite order which would give him a chance to tell the court he is entitled to a bonus which we prevented his getting by ordering the small pump (20 hp.) * * *

"I feel sure he can produce to get a 10% bonus with proper pump and probably the 20% * * *."

In this letter the engineer admits that the test of the well on February 12 had shown that the 20 horsepower motor would not deliver the admitted capacity of the well to the water treatment plant without overloading in violation of the specifications. He also admits his obligation under the specifications to approve the order of a motor of sufficient horsepower, and that, if he ordered the installation of a 20 horsepower motor knowing it would be insufficient, the contractor might, nevertheless, demand payment of the bonus under the contract. The letter is also an admission that delays in the completion of the contract were not due to any cause for which the contractor was responsible, and expresses the naive opinion that the courts will approve a breach of the contract by the City because of these delays.

The reference in the letter of February 16, 1946, to the "public and official attitude" of Beresford is made abundantly clear from the record. The attitude was expressed in the Mayor's demand for "water Now." The City's water supply was utterly inadequate to meet its needs. Although no delays chargeable to the contractor had occurred in the performance of the contract, its completion had required much greater time than the City had anticipated when the contract was let. The test of the well on February 12 had demonstrated that with the equipment on hand, plus an adequate bowl and motor, the well would produce and deliver to the City water treatment plant more than 121 gallons of water a minute. But, the delivery of water with less than specified equipment, supplemented by the production of the City's old well, would meet the City's immediate needs and silence public criticism. Either because the Mayor and City Council failed to understand the plain terms of the contract or because under pressure of public impatience with the City's water shortage the Mayor and City Council chose to ignore the terms of the contract, the City not only demanded the immediate completion of the well using the equipment on hand, but notified the contractor that when the contract was completed as demanded the City would not pay the contract price if the delivery to the City water plant did not equal the mini-

mum requirement. In one of his letters to the contractor the Mayor stated his interpretation of the contract, clearly erroneous, to be that the contractor was obligated to install the pump and motor delivered at the well for test purposes.

Before final installation of the well equipment, it was necessary that a permanent base for the pump be constructed, and to do this work, it was necessary to remove the temporary equipment from the well. This was done. The contractor in a letter to the engineer written before the well was completed had offered to leave the temporary equipment in the well pending the final order for pump and motor. The offer was clearly conditioned upon the City's approval of the size of the bowl and the power of the motor to be ordered for permanent installation. This offer was declined by the Mayor. There was testimony on behalf of the City, denied by the contractor, that after the test of the well on February 12, the contractor's president had orally repeated the offer to the Mayor and the City Council. After the removal of the temporary equipment from the well, the contractor prepared to take the test bowl, which both parties admitted was never intended for installation in the well, and the 20 horsepower motor, the insufficiency of which was admitted, away from the City. Its purpose was to have the 20 horsepower motor converted into a 25 horsepower motor and to order a necessary bowl. The contractor had arranged to have the conversion of the motor made within 10 days after delivery of it to a manufacturer in Chicago. In an effort to force the contractor to equip the well with the motor on hand, the Mayor seized the motor and refused to surrender it. Through oversight, he failed to capture the bowl. Repeated demands of the contractor for the surrender of the motor for conversion into the required horsepower were denied.

 In defense of this action the Mayor relied on the alleged oral promise of the contractor to leave the temporary equipment in the well. The trial court made no finding upon this disputed question. But the offer was conditioned on the City's agreement to authorize the order for and permit the installation of a bowl and motor of sufficient capacity to deliver the well's maximum production to the City's water plant. The City's insistence upon the permanent use of the equipment on hand and its flat refusal to permit the installation of any other or different equipment show that the offer, if made, was never accepted according to its terms. The contractor was under no obligation to leave the test equipment in the well, and its promise to do so, if made, was void for want of consideration. The evidence is undisputed that because of war shortages it was impossible to secure a new motor for immediate installation in the well, and that the removal of the 20 horsepower motor for conversion to a higher horsepower was necessary to avoid delay and to meet the terms of the contract. The specifications provided that no oral agreement between the contractor and any officer of the City should in any way affect or modify any of the terms and obligations of the contract.

On March 15, 1946, the contractor asked payment of the basic price of the well, $15,800, and claimed that the 10% bonus should be paid. It agreed, however, to waive the immediate payment of any bonus until it was determined that the well, properly equipped, would deliver water to the City treatment plant in quantity to entitle the contractor to payment of the bonus. In the letter in which this demand was made, the contractor repeated its assertion that delay in completion of the work since the test of the well was caused by the failure of the City or its consulting engineer to direct the order of equipment necessary to deliver the production of the well to the City water treatment plant.

The engineer replied to this letter by stating that in the situation existing the contractor had no claim for payment of the contract price of the well, to say nothing of the bonus. On March 18, 1946, the Mayor wrote a letter to the surety on the contractor's construction bond, sending copies of the letter to the contractor and the engineer, in which he stated that the contractor was insisting upon increasing the size of the motor from 20 to 25 horsepower in an effort to earn the 20% bonus by producing in excess of 121 gallons of water a minute at the City water treatment

plant. The Mayor again stated his erroneous interpretation of the contract, claiming that by its terms the contractor was required to install the 20 horsepower motor. Asserting that the situation with reference to the City's water supply was critical and that immediate production of water was imperative, he notified the bonding company and the contractor of the City's insistence on the installation in the well of the equipment on hand, concluding with the statement that the letter was mailed under requirements of the construction bond by unanimous vote of the City Council.

In reply to the Mayor's letter to the bonding company, the contractor on April 1 gave the City 30 days' written notice of its election to terminate the contract, charging the City with failure to make payments for work and materials when due, and with a breach of the contract by its refusal to permit installation of the equipment called for by the contract. Before the expiration of the 30 days' notice, the contractor proposed to the City that it pay the balance [1] of the agreed contract price for the construction of the well of the required minimum production, leaving the question of the payment of any bonus earned to await the delivery of water at the City water treatment plant. In this letter the contractor requested the return of its motor for conversion into a higher horsepower. The contractor offered, on receipt of check for the balance due on the well and the City's assurance that the 20 horsepower motor would be returned to it, to immediately order a pump bowl and motor of proper size and leave the determination of its right to a bonus to be decided after the installation of permanent equipment. The City did not reply to this offer. Instead, it accepted the notice of termination of the contract, purchased from others a bowl not described in the testimony, and installed this bowl and the contractor's pump and motor in the well.

The district court found that the contractor ordered and installed in the well temporary equipment for testing the well to determine "the proper bowls and impellors to be placed therein as permanent equipment;" and that the contractor "did fail and neglect to complete said well and did fail and neglect to install the permanent bowls and impellors together with the other necessary equipment, so that said well could be used by defendant." And:

"That no test to determine the capacity of said well was ever made and the Court finds from the admission and pleadings of the defendant that the capacity of said well is 100 gallons per minute."

The court found that the contractor was entitled to recover the contract price for drilling the well, $15,800, plus $2,414, the contract price for pumping equipment for the well, less $9,401 paid to the contractor on account of well construction, $1,064 expended by the City for water because of delay in performance, and $1,651.29 expended by the City for equipment purchased and for labor employed in installing the equipment in the well. Judgment was entered in favor of the contractor for $6,097.71.

The City was in default in its obligations under the contract in refusing to permit the contractor to install in the well the equipment called for by the contract. The inadequacy of the City's water supply and the necessity for the completion of a new well at the earliest possible moment were known at the time of the execution of the contract. The contract, however, did not fix a definite time for its completion. The delays between the execution of the contract and the testing of the well in the following February were due to causes beyond the control of either party. The delay after the completion of the well was due to the City's refusal to carry out its obligations under the contract and to authorize the order for the well equipment. The City's desperate need for water is no excuse for its seizure of the contractor's motor and its refusal to permit the installation in the well of the equipment called for by the contract. By the express terms of the agreement between the parties the contractor was entitled to an extension of time to complete the contract equal to

---

[1] On September 15, 1945, the City paid to the contractor on account of well construction the sum of $9,401.

the delay caused by the City's insistence on the installation of equipment which admittedly did not meet the terms of the specifications.

The evidence shows that had the City permitted the contractor to proceed with the contract according to its terms the contractor would have earned the contract bonus. The letters of the City's engineer are sufficient to establish the contractor's right to the contract price for well construction, plus a bonus of 20% of the contract price. Since the City made impossible the test of the completed installation required by the engineer's interpretation of the contract, it can not escape the payment of the bonus on the ground that the test was never made. The contractor is entitled to a judgment against the City for $11,973 (the difference between the contract price for full performance, plus the bonus of 20%, and the payment on account made by the City), less the reasonable cost to the contractor of completing the work called for by the contract, with interest from May 1, 1946. Unfortunately the evidence does not show the cost to the contractor for the completion of the work, except that the contract price for the bowl which the contractor did not supply was $440. It is evident that if the contractor had fully performed the contract it would have incurred further costs.

The City is not entitled to recover anything on its counterclaim.

The judgment of the District Court is reversed and this cause is remanded for further proceedings in accordance with this opinion.

The printed record in this case consists of 350 pages exclusive of index, and seems to have been prepared with little, if any, regard for the rules of this court. See Pet Milk Company v. Boland, 8 Cir., 1949, 175 F.2d 151.

Included in this record are the opening statements of counsel, occupying 14 printed pages, although no question is raised concerning the propriety of anything said by counsel. The writing entitled "Contract" consisting of 2 pages is printed twice. The specifications constituting part of the contract fill 34 pages of the printed record, although not more than 10 pages of the specifications contain anything pertinent on this appeal. More than 75 pages of the printed record are occupied with the reproduction of checks and vouchers and accounts introduced in evidence by appellee in support of its counterclaim. None of these exhibits is of any importance on the questions involved in this appeal. Approximately 70 pages of the printed record are used for the reproduction in full of correspondence between the parties. Not more than one-half of the space in the record occupied by these exhibits contains anything pertinent to the questions presented. The record contains at least 150 pages, the printing costs of which should not be charged to appellee. The Clerk of this court will in taxing costs disallow the cost of printing this immaterial matter.